IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| IN THE MATTER OF:<br><br>TOPP'S MECHANICAL, INC.,<br><br>                    Debtor(s). | CASE NO. BK21-40038-TLS<br><br>CHAPTER 11 |

ORDER

      This matter is before the court on the Subchapter V Trustee's objection (Fil. No. 78) to confirmation of the debtor's second amended Chapter 11 plan (Fil. No. 73). Hearing was held on September 22, 2021. Justin Eichmann and Ryan Dougherty appeared for the debtor; Trev Peterson appeared for American Exchange Bank; and James Overcash appeared as the Chapter 11 Subchapter V Trustee. The parties have now briefed the legal question at issue, and the matter is ready to be decided.

      For the reasons set forth below, the trustee's objection is sustained and confirmation is denied.

      The issue presented to the court concerns the debtor's proposed treatment of American Exchange Bank's § 1111(b) election to have its under-secured claim treated as secured. The Subchapter V Trustee asserts that the plan is overly generous on the bank's deficiency claim at the expense of other unsecured creditors.[1] The parties agree that there are no factual issues in dispute and that all other confirmation requirements have been met. Further, the only objection to confirmation is the one filed by the Subchapter V Trustee.

      The statutory basis for the trustee's objection is 11 U.S.C. § 1191(b) which governs confirmation standards when a class of claims — here, the unsecured creditor class — has not accepted the plan and is impaired under the plan. Specifically, one of the standards in such a situation is that the court can confirm a plan only if it does not discriminate unfairly and is fair and equitable with respect to each impaired class that has not accepted the plan.[2] 11 U.S.C. §1191(c) defines the "fair and equitable" confirmation requirement. With respect to a non-consenting class of secured creditors, § 1191(c)(1) mandates that in order to be fair and equitable the plan must meet the requirements of § 1129(b)(2)(A), which includes the requirement that the non-consenting secured creditor receive payments totaling at least the allowed amount of its claim of a value that

---

[1] The Subchapter V Trustee has standing to object to confirmation pursuant to 11 U.S.C. § 1183(b)(3)(B), which provides that the trustee shall appear and be heard at any hearing that concerns confirmation of a plan.

[2] The ballot report submitted by the debtor indicates that no member of the unsecured creditor class under the plan submitted a ballot. Therefore, the plan has not been accepted by the unsecured creditor class which is impaired under the plan.

is at least the present value of its collateral. Here, however, the secured creditor has accepted the plan. Therefore, this confirmation standard is not directly applicable, although it is a factor in the trustee's objection.

Instead, the non-consenting class here is the class of unsecured creditors for which 11 U.S.C. §1191(c)(2) defines "fair and equitable" to include the requirement that the debtor apply all of its disposable income for at least a three (3) year period for making payments under the plan and that the value of the plan distributions is not less than the debtor's disposable income. The trustee believes that the debtor's disposable income — and, therefore, distributions to unsecured creditors — is artificially low as a result of the debtor paying the bank's claim more than is necessary under §§ 1111(b), 1191(c)(1), and 1129(b)(2)(A).

***Section 1111(b)***

Section 1111(b) of the Bankruptcy Code provides in pertinent part:

> (b)(1)(A) **A claim secured by a lien on property of the estate shall be allowed or disallowed under section 502 of this title** the same as if the holder of such claim had recourse against the debtor on account of such claim, whether or not such holder has such recourse, **unless**—
>
> (i) **the class of which such claim is a part elects, by at least two-thirds in amount and more than half in number of allowed claims of such class, application of paragraph (2) of this subsection**;
>
> \* \* \*
>
> (2) **If such an election is made, then notwithstanding section 506(a) of this title, such claim is a secured claim to the extent that such claim is allowed.**

(Emphasis added.)

Section 1111(b)(2) allows holders of certain partially secured claims to waive their unsecured deficiency claims and – § 506 notwithstanding – have their entire debt treated as a secured claim.

That statute is not as straightforward as it might seem, and courts continue to wrestle with it. In contrast to *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235 (1989), where the Supreme Court said a "'natural reading' of § 506(b) of the Code expressed 'Congress' intent . . . with sufficient precision so that reference to legislative history . . . is hardly necessary,'" § 1111(b)'s meaning is less readily ascertainable on its face. *In re 222 Liberty Assocs.*, 108 B.R. 971, 978 (Bankr. E.D. Pa. 1990).

> The fact that commentators such as *Collier* and other courts interpreting § 1111(b) all refer to the legislative history when construing the section, supports our belief

> that the language, or the "natural reading," of the section is not so clear that reference to the legislative history is not necessary. *See In re Realty Investments, Ltd. V*, 72 B.R. 143, 145 (Bankr. C.D. Cal. 1987) (the court "struggled with the language of § 1111(b)(1)(B)(ii) . . ."); and *In re Woodridge North Apts., Ltd.*, 71 B.R. 189, 191 (Bankr. N.D. Cal. 1987) (discussing § 1111(b), the court states that "[t]he language of the Bankruptcy Code does not provide a clear answer.").

*Id.* at 978-79.

The legislative history of this section shows that when the Bankruptcy Code was enacted, Congress wanted to ensure that the value of a secured creditor's claim was protected regardless of volatility in the value of the collateral.

> . . . if a creditor loaned $15,000,000 to a debtor secured by real property worth $18,000,000 and the value of the real property had dropped to $12,000,000 by the date when the debtor commenced a proceeding under chapter 11, the plan could be confirmed notwithstanding the dissent of the creditor as long as the lien remains on the collateral to secure a $15,000,000 debt, the face amount of present or extended payments to be made to the creditor under the plan is at least $15,000,000 and the present value of the present or deferred payment is not less than $12,000,000 . . .

*In re S. Missouri Towing Serv., Inc.*, 35 B.R. 313, 314 (Bankr. W.D. Mo. 1983) (quoting Congressional Record, September 28, 1978, at H11104 reprinted in App 2 Collier on Bankruptcy IX–117 (15th ed.)).

> The real benefit of the election is that it protects the creditor against a quick sale of its collateral. The amount of the creditor's secured claim may be determined at a time when the value of the collateral is temporarily depressed. Without the election, the debtor could sell the collateral when its value quickly rebounds and net a considerable gain. By making the election, the creditor guards against such an opportunistic sale because it retains a lien on the collateral equal to the full amount of its claim, albeit without interest.

*First Fed. Bank of Cal. v. Weinstein (In re Weinstein)*, 227 B.R. 284, 295 n.12 (B.A.P. 9th Cir. 1998).

While an election under § 1111(b) costs the electing creditor the ability to participate in the class of unsecured creditors, the creditor receives the benefit of any post-confirmation appreciation of its collateral. "In effect, that creditor, by retaining its lien as security for its entire claim, holds that collateral hostage from the debtor's efforts to benefit from that postconfirmation appreciation of collateral until the entire amount of the creditor's claim is paid." *In re Scrubs Car Wash, Inc.*, 527 B.R. 453, 456 (Bankr. D. Colo. 2015).

In a Subchapter V case, the different confirmation standard gives under-secured creditors additional factors to consider before committing to a § 1111(b) election, making such decisions

subjective and case-specific. *In re Body Transit, Inc.*, 619 B.R. 816, 833 n.27 (Bankr. E.D. Pa. 2020).

One treatise describes the function of § 1111(b) this way:

> If the 1111(b) election is made, the secured creditor retains its secured claim overall — in other words, the unsecured claim is reduced to zero but the creditors' lien is retained for the full amount of the creditors' claim. In that event, however, if the collateral is returned to the lender, the lender's claim is satisfied in full. If the debtor seeks to retain the collateral, the debtor must pay to the electing creditor a stream of payments that meets two tests: (i) The stream of payments must have a present value equal to the value of the creditor's collateral (i.e., the allowed amount of the creditor's secured claim before the 1111(b) election), and (ii) the total amount of the creditor's stream of payments must equal the amount of the creditor's debt.

§ 18:49 Criteria for confirmation—Section 1111(b) Election, *Norton Creditors' Rights Handbook* (numeric examples omitted).

The practical application of § 1111(b)(2) is also often described by courts as a two-part test: "[T]he present value of the electing creditor's stream of payments need only equal the present value of the collateral, which is the same amount that must be received by the nonelecting creditor, but the sum of the payments must be in an amount equal [to] at least the creditor's total claim." *Weinstein*, 227 B.R. at 294 (citing *Wade v. Bradford*, 39 F.3d 1126, 1129 (10th Cir. 1994) (with a § 1111(b)(2) election, the under-secured creditor "must be paid the full amount of his claim over time, so long as the present value of such payments equals the value of the collateral."); *John Hancock Mutual Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 156 n.4 (3rd Cir. 1993); *IPC Atlanta Ltd. Partnership*, 142 B.R. 547, 555 (Bankr. N.D. Ga. 1992)).

The "two-part test" frequently mentioned by courts and commentators is not actually found in § 1111(b), which simply says the electing creditor's claim is secured to the extent it is allowed. Instead, the test is derived from 11 U.S.C. § 1129(b)(2)(A)(i)(II). Specifically, § 1191(c)(1) says that in order to be fair and equitable to a non-consenting secured class, the plan must meet the requirements of § 1129(b)(2)(A), which is part of the so-called "cram down" requirements for non-consensual confirmation. That section requires that "the holders of such claims retain the liens securing such claims" and "each holder … receive on account of such claim deferred cash payments totaling the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property[.]" In other words, in order to be fair and equitable to a secured creditor (including a creditor electing § 1111(b) treatment), the payments must pass two tests — they must equal at least the full amount of the claim and must also have a present value at least equal to the collateral value at the time of confirmation.

***The Plan***

In this case, the bank holds an allowed claim secured in part by the debtor's real estate and personal property. The total amount of the claim is $3,763,611.81. Real estate valued at

$1,224,821.76 and personal property valued at $898,873.12 secure a portion of the claim, with the unsecured balance of the claim totaling $1,639,916.93. The bank elected to have its claim treated as secured under § 1111(b)(2).

The debtor's plan proposes to pay the bank's claim in three separate components. The "real estate" claim is to be paid by amortizing $1,224,821.76 over 40 years at an annual interest rate of 5.25% with a balloon payment after five years. The "equipment" claim will be paid by amortizing $898,873.12 over 10 years at an annual interest rate of 5.25% with a balloon payment after five years. The plan proposes to pay the remainder of the bank's claim as follows:

> The Debtor shall make payments to American Exchange Bank calculated by amortizing $1,639,916.93 over 40 years, at an annual interest rate of 0.00%, with a balloon payment after five (5) years of payments. Payments shall be in the amount of $3,416.49 per month. The first payment shall be made 14 days after the effective date of the Plan, and payments shall continue each month thereafter, with a final balloon payment of all unpaid principal being due five (5) years from the date of the confirmation of the Plan.

Debtor's Second Amd. Plan, at 6 (Fil. No. 73).

As a result, under the trustee's calculations (which are not disputed), the bank is projected to receive a total of $4,266,520.98 under the plan. Specifically, the bank is slated to receive $2,626,604.05 on the secured portions of its claim[3], plus an additional $1,639,916.93 as a result of its § 1111(b) election.

The debtor also proposes to pay the non-consenting class of non-priority unsecured creditors a total of $26,019 over three years, beginning two years after the effective date of the plan:

> [T]he Debtor projects that the total amount available to the allowed non-priority unsecured claims during the term of the Plan will be $26,019.00. The allowed non-priority unsecured claims shall be paid pro rata over a period of thirty-six (36)

---

[3] *See* Tr.'s Br. at 5:

|  | Claim amount | Total monthly principal payments | Total monthly interest payments | Balloon payment | Total payments |
|---|---|---|---|---|---|
| Real estate | $1,224,821.76 | $51,446.04 | $315,170.31 | $1,173,375.72 | $1,539,992.07 |
| Personal property | $898,873.12 | $390,910.89 | $187,738.87 | $507,962.23 | $1,086,611.99 |
| Total Payment |  |  |  |  | $2,626,604.05 |

months. The monthly payment amount, to be paid pro rata to the allowed non-priority unsecured claims, will be $722.75, commencing 24 months after the effective date of the Plan, and continuing on the same day each month thereafter for a period of 35 months.

*Id.* at 7.

*Discussion*

The trustee has objected to the plan on the grounds that it discriminates against unsecured creditors and is not fair and equitable for unsecured creditors as required by 11 U.S.C. §1191 because the bank is receiving more than required on its § 1111(b)(2) claim, at the expense of the class of unsecured creditors. The trustee argues that the total stream of principal and interest payments to the bank under the plan ($4,266,520.98) far exceeds the bank's total claim ($3,763,611.81). In other words, the debtor is proposing to pay the bank approximately half a million dollars more than required.[4] The trustee argues these additional funds for the bank unfairly come at the expense of the unsecured creditors. According to the trustee, instead of paying the bank an additional $1,639,916.93 as a result of its § 1111(b) election, the debtor should only be required to pay an additional $1,137,007.76. That amount is calculated by taking the total claim of $3,763,611.81, less total payments on the secured portion of the claim in the amount of $2,626,604.05, equals $1,137,007.76.

In response, the bank takes the position that it will receive the value of its secured claim with interest over the five-year term of the plan, and then the balance will be refinanced and the bank will receive the full amount of its claim less the payments received during the term of the plan. "There is no windfall to [the bank] as asserted by the Trustee. [The bank] is receiving what Congress intended when it adopted §1111(b)." Bank's Br. In Supp. of Conf. at 4 (Fil. No. 88).

The debtor agrees with the bank's arguments and further points out that under the trustee's proposal the bank is effectively "stripped" of the interest component on the secured portion of its claim. While I disagree with debtor's characterization of the trustee's position as stripping away the interest component, I agree that the application of the interest component is the determining factor in this case. The question presented is whether the interest payments made on the present value of the collateral count toward the total payments owed to the electing creditor.

There appears to be little controversy in the caselaw that interest payments on the allowed secured claim under a § 1111(b) election should be permitted to serve the dual purpose of providing present value to the creditor and satisfying the debtor's obligation to pay the total allowed claim of the creditor. *See In re Pamplico Hwy. Dev. LLC*, 468 B.R. 783, 790-91 (Bankr. D.S.C. 2012) (adopting the "majority view" and permitting interest payments to apply to both parts of the § 1111(b) calculation). *See also Weinstein*, 227 B.R. at 295 n.13 ("[W]e believe that the interest payments made to provide the present value of the collateral must also be applied to reduce the total claim to be paid."); *In re Bloomingdale Partners*, 155 B.R. 961, 974 (Bankr. N.D. Ill. 1993)

---

[4] Total proposed payments to the bank under the plan of $4,266,520.98 less the total amount required under § 1111(b) of $3,763,611.81 results in "excess payment" of $502,909.17.

(allowing interest payments to satisfy the requirements of both §§ 1129(b)(2)(A)(i)(II) and 1111(b)(2)).

*Collier*'s editors, however, express some dissatisfaction with that approach, arguing that it "confuses and conflates transfers made on account of the debt – the payments referred to in subclause II – with transfers made to ensure that the secured creditor receives property (that is, a stream of payments) that has a present value equal to its collateral's value" and shifts the benefit of an increase in collateral value to the debtor. 7 *Collier on Bankruptcy* ¶ 1111.03[5][b].

Instead, to give an electing creditor the benefit of its bargain, *Collier* maintains that, in keeping with Congressional intent, the debtor should pay an amount that has a present value equal to the collateral's value in any case while allowing the creditor to ensure that the debtor is not taking advantage of inaccurate nonmarket valuation. *Collier* suggests three options for accomplishing this: a plan-specific payoff premium that appropriately accounts for the secured creditor's total allowed claim, a zero-coupon note, or a note bearing a below-market rate of interest. *Id.* The Sixth Circuit's Bankruptcy Appellate Panel endorsed this approach, holding

> there are two ways a debtor can ensure that a creditor will receive payments totaling its allowed claim and that its lien will remain in place until full payment has been received: (1) the debtor may specifically provide in the note for payment of an § 1111(b) premium in the event of a sale or prepayment, which is calculated as the difference between the total allowed claim and the outstanding principal balance remaining due on the note plus the payments made to date, or (2) the debtor may provide for a note in the face amount of the electing creditor's allowed claim but with a below market interest rate such that the present value of the note would still only be the present value of the collateral.

*In re Pamplico Highway Dev., LLC*, 468 B.R. 783, 791–92 (Bankr. D.S.C. 2012) (*citing Gen. Elec. Credit Equities, Inc. v. Brice Road Dev., L.L.C. (In re Brice Road Dev., L.L.C.*), 392 B.R. 274, 287 (B.A.P. 6th Cir. 2008)).

Regardless of whether there are two, three or more ways to ensure the § 1111(b) electing creditor receives all that it is entitled to receive under § 1129(b)(2)(A), this court believes that the majority view is the better reasoned approach and concludes that the interest component of a debtor's stream of payments may serve a dual purpose of satisfying the total allowed claim of the creditor and providing present value to the creditor.[5] "This result [applying interest payments to reduce the entire claim] gives effect to the plain language of § 1129(b)(2)(A)(i) which merely requires that in a cram down, the creditor making the § 1111(b)(2) election receive a stream of payments equal to its total claim and with a present value equal to the value of the collateral. Requiring anything more would be an unwarranted and unsupportable extension of the statutory requirements of § 1129(b)(2)(A)." *Weinstein*, 227 B.R. at 295 n.13.

---

[5] The court declines to take a position on the proposed solution articulated in the trustee's brief. There are several ways the debtor can treat the electing creditor's claim while still meeting the fair and equitable requirement.

Perhaps the existence of the two-part test in § 1129(b)(2)(A)(i)(II) has led some to conclude that there must be two different payment streams — one to pay the present value of the collateral and one to pay the balance of the total claim (similar to that which is proposed in the case at hand). But that is not what the statute provides. Instead, it calls for a single stream of payments that meets two tests:

> Subsection (II) of § 1129(b)(2)(A)(i) guarantees an electing creditor a stream of payments equal to its total claim. However, the stream of payments need only have a present value "of at least the value of such holder's interest in the estate's interest in such property," i.e., the value of the collateral. 11 U.S.C. § 1129(b)(2)(A)(i)(II). In other words, the present value of the electing creditor's stream of payments need only equal the present value of the collateral, which is the same amount that must be received by the nonelecting creditor, but the sum of the payments must be in an amount equal [to] at least the creditor's total claim.

*Id.* at 294 (citations omitted).

### *Conclusion*

Because the debtor's second amended Chapter 11 plan proposes to pay to American Exchange Bank far more than it is entitled to receive as a result of its election under 11 U.S.C. § 1111(b), there is less money available to pay to unsecured creditors. Accordingly, the plan discriminates unfairly and is not fair and equitable to the class of unsecured creditors. Confirmation is denied and debtor shall file an amended plan.

IT IS ORDERED: The Subchapter V Trustee's objection (Fil. No. 78) to confirmation is sustained. The debtor shall file an amended plan by December 14, 2021.

DATED: November 23, 2021.

BY THE COURT:

/s/Thomas L. Saladino
Thomas L. Saladino
Chief Bankruptcy Judge

Notice given by the court to:
    *James A. Overcash
    Ryan J. Dougherty
    Justin D. Eichmann
    Trev Peterson
    United States Trustee

Movant (*) is responsible for giving notice to other parties if required by rule or statute.